John Mejia (Bar No. 13965)
Leah Farrell (Bar No. 13696)
AMERICAN CIVIL LIBERTIES UNION OF
UTAH FOUNDATION, INC.
355 N. 300 W.
Salt Lake City, Utah 84103
Telephone: 801.521.9862
Facsimile: 801.532.2850
E-mail: jmejia@acluutah.org
E-Mail: lfarrell@acluutah.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| Dustin Law Porter and Steven Drollette,<br><br>    Plaintiffs,<br><br>v.<br><br>Daggett County, Utah; Mike Haddon, Interim Executive Director, Utah Department of Corrections, in his official capacity; Jeffrey Toone; Erik Bailey, in his official capacity; Jerry Jorgensen; Benjamin Lail; Joshua Cox; Logan Walker; Rodrigo Toledo; and Does 1-20.<br><br>    Defendants. | **AMENDED COMPLAINT**<br><br>**(Jury trial demanded)**<br><br><br>Case No. 2:18-cv-389 JNP |

## PRELIMINARY STATEMENT

1.      Plaintiffs are victims and survivors of abuse that the Utah Attorney General decried as "unbelievably inhumane conduct" while incarcerated in the State of Utah's custody in the Daggett County Jail (the "Jail").   Plaintiffs bring this case to hold Defendants accountable for their actions that caused them to suffer this "unbelievably inhumane conduct," and to ensure that such conduct does not happen to them or others again.

2. During their incarceration at the Jail, Plaintiffs lived in fear for their lives, health, safety and welfare because of the ongoing abuse they and other prisoners experienced.

3. Plaintiffs were assaulted, bullied, and exposed to perils to their lives and well-being by Defendants, government actors and agencies with a duty to safeguard their welfare.

4. Plaintiffs survived being purposely shot without justification by an electroshock weapon ("Taser") fired by an officer charged by the State of Utah ("State") and Daggett County ("County"). The discharge of electric current into Plaintiffs' bodies inflicted pain and exposed Plaintiffs to potentially deadly force.

5. That officer also repeatedly brandished weapons against the Plaintiffs without justification and caused fear and emotional distress.

6. Plaintiffs were also subjected to physical trauma from being attacked by dogs that State and Daggett officials allowed a Jail officer to bring to the Jail, and from chokings and other physical battery by that Jail officer.

7. These attacks Plaintiffs endured were part of a larger culture of abuse that had long been fostered at the Jail by the County and its officials and employees.

8. All Defendants were responsible for protecting Plaintiffs' dignity and humanity against such a culture, and all Defendants failed their duties to Plaintiffs.

9. The repeated and systemic abuse Plaintiffs suffered caused them long-term mental and physical harm, that continues today and will continue in the future.

10. State officials were long on notice of the specific dangers facing Plaintiffs at the Jail and deliberately chose not to take action to address them.

11.    If Department officials do not institute policy changes designed to protect the health and safety of state prisoners housed in county jails, there will continue to be an unacceptably high risk of harm to State prisoners at those jails.

12.    If the County does not institute policy changes at the Jail, there will continue to be a culture of danger and abusive practices.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States, thereby satisfying federal question jurisdiction.

14.    This Court has supplementary jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. §1367.

15.    Venue is proper in the Central Division of Utah because the events herein occurred in Daggett County, Utah.

## PARTIES

16.    Plaintiff Dustin Porter is an adult resident of the State of Utah.

17.    Plaintiff Steven Drollette is an adult resident of the State of Utah.

18.    Defendant Mike Haddon is an adult resident of the State of Utah. He was recently named the interim Executive Director of the Utah Department of Corrections. Interim Director Haddon is responsible for the care and safety of those sentenced to longer terms of incarceration, and is ultimately responsible for administering the Inmate Placement Program ("IPP").   He is sued in his official capacity.

19.     Defendant Daggett County is a political subdivision of the State of Utah that can

sue and be sued in its own name.  The County operates, governs, and is responsible for the

County Sheriff's Department, whose responsibilities include operating the Jail.  Plaintiffs sue the

County for damages and injunctive relief for injuries directly caused by the County's policies

and practices.

20.     Defendant Jeffrey Toone was a caseworker for the Department assigned to be the

point of contact between State prisoners housed at the Jail, including Plaintiffs, and the

Department.  Mr. Toone is sued in his personal capacity.

21.     Defendant Jerry Jorgensen is an adult resident of the State of Utah.  He was the

elected sheriff of the County during Plaintiffs' incarceration at the Jail.  Sheriff Jorgensen was

responsible for formulating, setting, implementing, and enforcing the rules, regulations, policies,

practices, and customs at the Jail, including those pertaining to the health, safety, and well-being

of prisoners.  He had supervisory control and authority over the Defendants employed by the

County.  At all relevant times, Sheriff Jorgensen was acting or failing to act under color of law.

He is sued in his personal capacity.

22.     Defendant Erik Bailey is the current sheriff of the County.  Sheriff Bailey is

responsible for formulating, setting, implementing, and enforcing the rules, regulations, policies,

practices, and customs at the Jail, including those pertaining to the health, safety, and well-being

of prisoners.  He has supervisory control and authority over County employees related to

operating the Jail.  He is sued in his official capacity.

23.     Defendant Benjamin Lail is an adult resident of the State of Utah.  He was the Jail

Commander at the time the Plaintiffs were incarcerated at the Jail.  Lt. Lail was responsible for

formulating, setting, implementing, and enforcing the rules, regulations, policies, practices, and customs at the Jail, including those pertaining to the health, safety, and well-being of prisoners. He had supervisory control and authority over Deputy Cox, Deputy Walker, and Deputy Toledo. At all relevant times, Lt. Lail was acting or failing to act under color of law.  He is sued in his personal capacity.

24.     Defendant Joshua Cox is an adult resident of the State of Utah. He is a former County Deputy, employed by the County at the Jail when the Plaintiffs were incarcerated there. Deputy Cox was responsible for implementing and enforcing the rules, regulations, policies, practices, and customs at the Jail, including those pertaining to the health, safety, and well-being of prisoners.  At all relevant times, Deputy Cox was acting or failing to act under color of law. He is sued in his personal capacity.

25.     Defendant Rodrigo Toledo is an adult resident of the State of Utah.  He is a former County Deputy, employed by the County at the Jail when the Plaintiffs were incarcerated there.  Deputy Toledo was responsible for implementing and enforcing the rules, regulations, policies, practices, and customs at the Jail, including those pertaining to the health, safety, and well-being of prisoners. At all relevant times, Deputy Toledo was acting or failing to act under color of law.  He is sued in his personal capacity.

26.     Defendant Logan Walker is an adult resident of the State of Utah. He is a former County Deputy, employed by the County at the Jail when the Plaintiffs were incarcerated there. Deputy Walker was responsible for implementing and enforcing the rules, regulations, policies, practices, and customs at the Jail, including those pertaining to the health, safety, and well-being

of prisoners. At all relevant times, Deputy Walker was acting or failing to act under color of law. He is sued in his personal capacity.

27.     Defendants John Does 1-20 are the Department and County employees who were either involved in the abuse against Plaintiffs or who were deliberately indifferent to the culture of violence and abuse Plaintiffs endured their time at the Jail.

## FACTUAL ALLEGATIONS

**The Inmate Placement Program**

28.     The Plaintiffs were assigned by the Department to be confined at the Jail as part of the IPP.

29.     Under the IPP, the Department contracts with various counties in Utah to incarcerate State prisoners sentenced to incarceration and entrusted to the Department in county jails.

30.     As of March 2018, about 20 percent of State prisoners entrusted to the Department's care were confined in county jails.

31.     Under the IPP, the Department makes unilateral decisions about which prisoners are assigned to which county jails.  State prisoners have no input in where they are being confined by the Department as part of that program.

32.     The Department has no formal means for prisoners in its custody to directly report abuse by county jail employees to the Department.

33.     Instead of direct reporting, the Department relies on the county jails to follow each jail's grievance system.  The county jails that are part of the IPP are contractually obligated to forward grievances to the Department on a regular basis.

34.     On information and belief, the Department periodically conducted inspections of the Jail, to monitor it for compliance with certain standards.

**Daggett County Jail**

35.     In September 2007, two State prisoners confined to the Jail as part of the IPP escaped from the Jail by simply walking out.

36.     In response, the Department temporarily removed all State prisoners from the Jail.

37.     Eventually, the Department sent prisoners back to the Jail.

38.     From at least the time of that incident, Department officials have been on notice that close monitoring of the Jail was necessary for several reasons, including:  the Jail is in a geographically remote location, and Daggett County is sparsely populated;  the County had a difficult time finding candidates willing to work as deputies at the Jail, leading the County to be less demanding of candidates in hiring and more willing to tolerate abusive behavior after hiring and;  the County derives about 30% of its revenue from the funds generated from the Department for confining State prisoners through the IPP.

39.     Despite their knowledge of the risks of housing prisoners at the Jail, the Department failed to properly monitor the Jail after sending prisoners back to the Jail.

40.     In 2017, Sheriff Jorgensen was criminally charged and pleaded guilty to a charge related to failing to keep prisoners under his care safe since 2014.  As described below, from at least that time, Sheriff Jorgensen allowed a policy and practice that can be summarized as "if it wasn't on camera, it didn't happen."  In short, the County's policy and practice the Jail since 2014 was to allow supervisors and staff to engage in abuse as long as they were not recorded by Jail cameras when doing so.

**Plaintiffs**

41.     Plaintiffs Steven Drollette and Dustin Porter were prisoners under the responsibility of Department in 2016 and 2017.

***Steven Drollette***

42.     Mr. Drollette was sentenced to be incarcerated by the Department in around June 2013.  After a short period of screening at the Utah State Prison, he was sent to the Jail as part of the IPP program, also around June 2013.

43.     Mr. Toone was assigned to Mr. Drollette.  Mr. Toone was required to visit Mr. Drollette once per quarter, and generally did so.

44.     From the start of the time Mr. Drollette was confined in the Jail, he regularly heard Lt. Lail say that if a Jail guard's conduct "wasn't on camera," it "didn't happen."

45.     While Lt. Lail generally stated this phrase in a seemingly joking manner, it was Mr. Drollette's understanding that there was a serious intent behind Lt. Lail's words.

46.     Mr. Drollette first encountered Deputy Cox in about 2015.

47.     Mr. Drollette earned a gate pass in about mid-2015.  A gate pass is permission from the Department and the Jail for a prisoner to be able to leave Jail grounds, and is a relatively rare privilege earned through long term good behavior and other efforts by prisoners.

48.      Deputy Cox was assigned to be a supervisor of the outside work crew at about that time.

49.     Mr. Drollette witnessed Deputy Cox wrestling with other prisoners who were part of the work crew, including Mr. Porter and several other prisoners.

50.     On a few occasions before Deputy Cox started to wrestle with the prisoners, and on other occasions, Mr. Drollettte heard Deputy Cox radio to officers in the Jail's control room to turn of the camera in the areas where he was engaged in that behavior.

51.     In the summer of 2016, Mr. Drollette attended a barbeque on Jail grounds.  The barbeque was a farewell for a prisoner who was leaving the Jail, and included prisoners with gate passes.

52.     After the event was over, Deputy Cox began calling prisoners' names, telling them it was their turn for him to shock them with a Taser as part of an initiation into the work crew.

53.     Deputy Cox told the prisoners that he would remove them from the work crew if he did not allow them to apply the Taser against them.

54.     After much pressure, one of the other prisoners stated that he did not want to lose his job and would allow Deputy Cox to shock him without resistance.  Mr. Drollette watched Deputy Cox shock that person in the Jail's woodshop.

55.     Deputy Toledo and Deputy Walker were also present when Deputy Cox applied the Taser and appeared to Mr. Drollette be enjoying themselves.

56.     Deputy Cox then pressured Mr. Drollette to submit himself to being shocked with the Taser by telling him it was an initiation for the work crew and he would lose his job if he refused.

57.     Deputy Cox eventually made it clear that he would not allow Mr. Drollette to return to his dorm until he applied the Taser against Mr. Drollette.

58.     Mr. Drollette said something to the effect of not wanting to lose his job or get in trouble, and then Deputy Cox deployed the Taser against his arm for several seconds.

59.     As Deputy Cox was shocking him with the Taser, Mr. Drollette pulled away in pain.  Deputy Cox became upset with Mr. Drollette and said he had not lasted long enough.

60.     Deputy Cox then deployed the Taser against Mr. Drollette in the arm again for several more seconds.

61.     Being shocked by the Taser caused Mr. Drollette extreme physical and emotional pain.

62.     Deputy Toledo and Deputy Walker saw Deputy Cox abuse Mr. Drollete with the Taser, did nothing to stop it, and appeared to enjoy it.

63.     Soon after Deputy Cox attacked him with the Taser, Mr. Drollette grew angry with Deputy Cox and refused to play along with Deputy Cox's attempts to act friendly toward him.

64.     A few weeks after Deputy Cox shocked Mr. Drollette with the Taser, Deputy Cox attacked Mr. Drollette with his dog.

65.     At that time, Mr.  Drollette was working inside the sally port on fixing a chain saw or lawn mower.  He heard Deputy Cox give a command to the dog in German.

66.     After the dog received that command, it rushed at Mr. Drollette and started to jump against him and bite at him.

67.     As Mr. Drollette struggled to push the dog off, the dog bit his hands. The dog drew blood after it scratched his hands with its teeth.

68.     Mr. Drollette told Deputy Cox to, "stop it and call the dog off" and also stated, "it's messed up."

69.     Eventually Deputy Cox called off the dog and finally allowed Mr. Drollette to turn back to his work.

70.     A few moments later, Mr. Drollette again heard Deputy Cox give a German command.  Deputy Cox's dog rushed Mr. Drollette again, this time biting him on the back of his leg.

71.     During this ordeal, the dog bit into Mr. Drollette's leg seriously enough to cause bleeding and leave puncture wounds.

72.     Mr. Drollette then told Deputy Cox that he was going to "put in for medical on it," or make a formal request for medical care from the Jail.

73.     Deputy Cox responded to Mr. Drollette that he only needed a band-aid.  Mr. Drollette asked if the dog had received an updated rabies shot and Deputy Cox told Mr. Drollette that the dog was "cleaner than you are."

74.     Deputy Cox discouraged and threatened Mr. Drollette with retaliation if Mr. Drollette sought medical attention for his wounds.  Owing to this threat, Mr. Drollette did not receive any immediate evaluation or treatment of the wounds he suffered.

75.     Mr. Drollette noted that during the dog attack, the cameras on the sally port where he was working did not appear to be recording.

76.     Fearing retaliation by Deputy Cox and the other guards, Mr. Drollette did not initially report the abuse he was suffering.

77.     Mr. Drollette does not recall Mr. Toone ever asking him about about his treatment by the guards at the Jail.  Mr. Drollette recalled observing Mr. Toone have a personal relationship with the Jail staff and thinking that reporting the abuse might cause Mr. Toone to retaliate against Mr. Drollette.

78.     In late 2016, Mr. Drollette was transferred by Department officials to the Box Elder County Jail.  Once he was out of the Jail at Daggett County and felt safe from retaliation by Deputy Cox and other Jail employees, Mr. Drollette wrote a letter to Sheriff Jorgensen describing the abuse he and others had suffered.  For several weeks, Mr. Drollette did not hear from Sheriff Jorgensen.

79.     After it was clear that Sheriff Jorgensen was not going to respond to Mr. Drollette, Mr. Drollette wrote a letter to Department officials.  Mr. Drollette provided that letter to a third party.

80.     Sheriff Jorgensen was later charged by the State of Utah for failing to keep prisoners safe.

81.     Sheriff Jorgensen knew of the abusive practices against Plaintiffs and others that were occurring at the Jail before, during, and after they were happening.  He did nothing to stop or prevent the abuse.

82.     Eventually, investigators from the State asked Mr. Drollette about what had happened at the Jail.

83.     Even after becoming aware of the Taser and dog attacks, neither Mr. Toone nor any Department official ensured that Mr. Drollette was evaluated for possible physical repercussions from being shocked with the Taser or bitten and scratched by the dog.

84.     Likewise, Mr. Toone and other Department officials failed to offer Mr. Drollette any mental health assessment or assistance related to the traumatic events he had suffered.

85.     In particular, Mr. Toone was also assigned to be Mr. Drollette's caseworker at the Box Elder County jail.  While Mr. Toone inquired generally about Mr. Drollette's state after the he became aware of the abusive incidents, Mr. Toone made no affirmative effort to offer any additional help.

86.     Due to the abuse at Daggett County Jail, Mr. Drollette suffers from a frequent and severe eye twitch.

87.     Upon witnessing Mr. Drollette's eye twitch, family and co-workers have expressed alarm and concern, even asking if he is having a stroke.

88.     Mr. Drollette continues to experience an eye twitch whenever he feels stressed or nervous and feels very embarrassed when it happens. Mr. Drollette sometimes places his hand over his eye so others cannot see it.

89.     Mr. Drollette continues to suffer from reoccurring nightmares about violent confrontations with Deputy Cox.

### Dustin Porter

90.     Mr. Porter was incarcerated at the Jail as part of the IPP program in 2016 and 2017.

91.     Starting in about March 2016, Deputy Cox began to interact with Mr. Porter in an inappropriate and increasingly violent and abusive manner while at the Jail.

92.     Deputy Cox's inappropriate behavior toward Mr. Porter started with relatively minor incidents, including punching Mr. Porter on the arm.

93.     After some punching incidents, the violence began to escalate.  Deputy Cox began to wrestle with Mr. Porter in an extreme fashion.

94.     On one occasion, Deputy Cox "choked out" Mr. Porter, putting him in a headlock and squeezing hard enough to cut of his air supply.

95.     On another occasion, Deputy Cox reached over Mr. Porter's head, stuck his finger up inside Mr. Porter's nose, and pulled Mr. Porter backward onto the ground.

96.     These incidents caused Mr. Porter physical and emotional pain.

97.     There was no justification for Deputy Cox to use this physical force against Mr. Porter: these incidents were unilaterally initiated by Deputy Cox.  Mr. Porter could not resist because he was afraid that he would be accused of harming Deputy Cox if he fought back.

98.     After these incidents, Deputy Cox told Mr. Porter, "You can't do shit, I'm a cop," and "This badge says I can do anything I want to anyone here."

99.     Deputy Cox also told Mr. Porter, "if it's not on camera, it didn't happen."

100.    Around the same time, Deputy Cox told Mr. Porter that he was training a police dog.  Deputy Cox instructed Mr. Porter to assist him with that training.

101.    On one occasion, Deputy Cox instructed Mr. Porter to hold an apparatus for the dog to attack and not let go.  On Deputy Cox's command, the dog attacked the apparatus Mr. Porter was holding, violently yanking Mr. Porter arms, shoulders, and back.

102.    This attack caused Mr. Porter physical and emotional injuries that last to the present time and are expected to continue in the future.

103.     Later, Deputy Cox explained that if Mr. Porter wanted to become part of the outside work crew on the gate pass Mr. Porter had earned, he needed to undergo the initiation: being subjected to a Taser.

104.     Deputy Cox employed the Taser against Mr. Porter one two occasions: once in Mr. Porter's cell and again inside the walk-in kitchen storage area.

105.     When Deputy Cox applied the Taser against Mr. Porter in his cell in about January 2017, Deputy Toledo was also present.  Deputy Toledo did nothing to stop Deputy Cox from using the Taser against Mr. Porter.

106.     Both Deputy Cox and Deputy Toledo appeared to Mr. Porter to be enjoying themselves at the expense of Mr. Porter's suffering when Deputy Cox attacked Mr. Porter with the Taser in his Jail cell.

107.     Deputy Cox's shocking of Mr. Porter, causing Mr. Porter extreme physical and emotional suffering.

108.     Deputy Cox threatened that if Mr. Porter reported any of the abuse he suffered to State authorities, Deputy Cox would arrange for retaliation against Mr. Porter, such as making sure that Mr. Porter was sent to solitary confinement in the Draper prison.

109.     Deputy Cox told Mr. Porter that if he reported the abuse, nobody would believe Mr. Porter because Deputy Cox was in law enforcement.

110.     Because he was afraid of violent retaliation by Deputy Cox and Deputy Toledo, Mr. Porter did not immediately tell authorities about the abuse.

111.     In about February 2017, two investigators from the State of Utah visited Mr. Porter.  Mr. Porter revealed some of the abuse he had suffered at the Jail to the investigators.

112.    Not long after he reported the abuse, Mr. Porter was transferred back to the Utah State Prison in Draper, Utah.

113.    Neither the County nor the State ever offered Mr. Porter a mental of physical evaluation for the consequences of the abuse he had suffered.

114.    Mr. Porter still suffers from symptoms of post-traumatic stress resulting from his abuse, including anxiety and nightmares.

115.    Mr. Porter also suffers from long term physical damage caused by to the abuse, including numbness and pain in his hands.

**Department and County Defendants**

116.    Sheriff Jorgensen was criminally charged with failing to take care of the prisoners in his care since 2014.  Sheriff Jorgensen pleaded guilty to that charge.

117.    At the time of Plaintiffs' incarceration at the Jail, Sheriff Jorgensen and Lt. Lail were the County's policymakers in terms of the policies and practices at the Jail.

118.    On information and belief, Sheriff Jorgensen and Lt. Lail fostered a culture of abuse at the Jail, encouraging Jail guards to treat weapons, such as the Taser, as toys.

119.    Deputy Cox was criminally convicted of abusing prisoners at the Jail.  During his sentencing, a former Jail guard contended that the culture of sadism at the Jail started long before Deputy Cox became a Jail employee.

120.    The former guard explained that he understood Jail policy, as explained by Lt. Lail, as "if it didn't happen on camera, it didn't happen."

121.    That former Jail guard explained that Lt. Lail had employed the Taser against Jail guards.

122.    Sheriff Jorgensen and Lt. Lail were aware of the specific incidents of abuse Plaintiffs suffered at the hands of Deputy Cox, encouraged and assisted by Deputy Walker and Deputy Toledo, either they were happening or shortly after.

123.    As part of the policy and practice of the County, Sheriff Jorgensen and Lt. Lail condoned the specific abuse of Plaintiffs by Deputy Cox, Deputy Walker, and Deputy Toledo.

124.    Sheriff Jorgensen and Lt. Lail actively provided improper training and supervision to officers responsible for the welfare of the Plaintiffs.

125.    The County's culture and improper training directly resulted in the mistreatment of the Plaintiffs.

126.    Mr. Toone had, at a minimum, constructive knowledge of the policy and practice of abusing prisoners promoted by Sheriff Jorgensen and Lt. Lail.

127.    Mr. Toone had, at a minimum, constructive knowledge that guards were using weapons for sadistic purposes at the Jail.

128.    Mr. Toone had, at a minimum, constructive knowledge that Jail supervisors allowed Deputy Cox to bring dogs to the Jail to attack prisoners.

129.    Plaintiffs suffered injuries proximately caused by the willful misconduct or deliberate indifference of Defendants.

130.    Plaintiffs were subjected to extreme, long-term abuse while under the responsibility of the Department and the County and their officials and agents.

131.    As a result of the misconduct of Defendants, Plaintiffs collectively suffered damages in an amount to be proven at trial.

132.    As a result of the misconduct of Defendants, the Plaintiffs have suffered past, present and future general damages, including physical pain and suffering, emotional pain and suffering, loss of enjoyment of life, permanent scarring and permanent impairment/disability.

133.    Defendants' actions were egregious, warranting punitive damages.

134.    Plaintiffs' damages were caused by the wrongful acts of the Defendants.

135.    Each Claim below incorporates each of the other Paragraphs of this Complaint as if pleaded therein.

**FIRST CLAIM FOR RELIEF**
**(Against Daggett County)**
**(42 U.S.C. § 1983; Violation of Eighth Amendment)**

136.    The County, through Sheriff Jorgensen, Lt. Lail, and others, maintained various policies and practices that directly led to the constitutional deprivations and damages Plaintiffs suffered.

137.    These policies included:

a.    Encouraging Jail supervisors and staff to use weapons, including Tasers, for sadistic purposes;

b.    Allowing Jail staff to bring a police dog and a personal dog into the Jail for the purpose of attacking prisoners; and

c.    Allowing Jail staff to otherwise abuse prisoners in their care.

138.    Each of these policies caused the behavior that led to the violations of Plaintiffs' rights to be free from cruel and unusual punishment in this case.

**SECOND CLAIM FOR RELIEF**
**(Against Daggett County)**
**(Article I, Section IX of the Utah State Constitution, Excessive Rigor)**

139.    The County, through Sheriff Jorgensen, Lt. Lail, and others, maintained various policies and practices that directly led to the constitutional deprivations and damages Plaintiffs suffered.

140.    These policies included:

    a.    Encouraging Jail supervisors and staff to use weapons, including Tasers, for sadistic purposes;

    b.    Allowing Jail staff to bring a police dog and a personal dog into the Jail; and

    c.    Allowing Jail staff to otherwise abuse prisoners in their care.

141.    Each of these policies caused the behavior that led to the violations of Plaintiffs' rights under Article I, Section IX of the Utah State Constitution to be free from excessive rigor in this case.

**THIRD CLAIM FOR RELIEF**
**(Against Sheriff Jorgensen)**
**(42 U.S.C. § 1983; Violation of Eighth Amendment)**

142.    On information and belief, Sheriff Jorgensen was aware of the abuse suffered by Plaintiffs at the Jail.

143.    Sheriff Jorgensen was deliberately indifferent to the kinds of abuse against Plaintiffs.  Sheriff Jorgensen knew, at a minimum, that Jail supervisors and staff allowed Tasers to be used for sadistic purposes, that Deputy Cox brought his dogs to the Jail, and that Deputy Cox wrestled with prisoners.

144.     Despite knowing the risks of harm to prisoners from these abusive behaviors, Sheriff Jorgensen allowed Jail supervisors and staff to continue them.  The failure to curb these practices led to the harms suffered by Plaintiffs here.

## FOURTH CLAIM FOR RELIEF
### (Against Sheriff Jorgensen)
### (Article I, Section IX of the Utah State Constitution, Excessive Rigor)

145.    On information and belief, Sheriff Jorgensen was aware of the types of abuse suffered by Plaintiffs at the Jail described herein.

146.    Sheriff Jorgensen was deliberately indifferent to the kinds of abuse against Plaintiffs.  Sheriff Jorgensen knew, at a minimum, that Jail supervisors and staff allowed Tasers to be used for sadistic purposes, that Deputy Cox brought his dogs to the Jail, and that Deputy Cox wrestled with prisoners.

147.    Despite knowing the risks of harm to prisoners from these abusive behaviors, Sheriff Jorgensen allowed Jail supervisors and staff to continue them.  This failure to curb these practices led to the harms suffered by Plaintiffs here.

## FIFTH CLAIM FOR RELIEF
### (Against Lt. Lail)
### (42 U.S.C. § 1983; Violation of Eighth Amendment)

148.    Lt. Lail actively trained Jail supervisors and staff to engage in the types of abuse suffered by Plaintiffs at the Jail described herein, including shocking them with Tasers.

149.    Despite knowing the risks of harm to prisoners from these abusive behaviors, Lt. Lail encouraged Jail supervisors and staff to continue them.  Lt. Lail's endorsement of these practices led to the harms suffered by Plaintiffs here.

## SIXTH CLAIM FOR RELIEF
### (Against Lt. Lail)
### (Article I, Section IX of the Utah State Constitution, Excessive Rigor)

150.    Lt. Lail actively trained Jail supervisors and staff to engage in the types of abuse suffered by Plaintiffs at the Jail, including shocking them with Tasers.

151.     Despite knowing the risks of harm to prisoners from these abusive behaviors, Lt. Lail encouraged Jail supervisors and staff to continue them.  Lt. Lail's endorsement of these practices led to the harms suffered by Plaintiffs here.

## SEVENTH CLAIM FOR RELIEF
### (Against Deputy Cox)
### (42 U.S.C. § 1983; Violation of Eighth Amendment)

152.     Deputy Cox engaged in violent and outrageous behavior towards Plaintiffs as described herein.  Deputy Cox's actions were malicious and sadistic, and were undertaken for the purpose of harming Plaintiffs.

153.    Deputy Cox's behavior violated Plaintiffs' constitutional right to be free from cruel and unusual punishment and caused them severe and ongoing physical and emotional harms.

## EIGHTH CLAIM FOR RELIEF
### (Against Deputy Cox)
### (Article I, Section IX of the Utah State Constitution, Excessive Rigor)

154.     Deputy Cox engaged in violent and outrageous behavior towards Plaintiffs as described herein.  Deputy Cox's actions were malicious and sadistic, and were undertaken for the purpose of harming Plaintiffs

155.    Deputy Cox's behavior violated Plaintiffs' right to be free from excessive rigor and caused them severe and ongoing physical and emotional harms.

## NINTH CLAIM FOR RELIEF
### (Against Deputy Toledo)
### (42 U.S.C. § 1983; Violation of Eighth Amendment)

156.    Deputy Toledo was deliberately indifferent to the risks posed by the violent and sadistic behavior towards Plaintiffs that he personally witnessed, as described herein.

157.   Rather than stop Deputy Cox from abusing Plaintiffs, Deputy Toledo encouraged Deputy Cox's behavior.

158.   Deputy Toledo's behavior violated Plaintiffs' constitutional right to be free from cruel and unusual punishment and caused them emotional and physical harm.

**TENTH CLAIM FOR RELIEF**
**(Against Deputy Toledo)**
**(Article I, Section IX of the Utah State Constitution, Excessive Rigor)**

159.   Deputy Toledo was deliberately indifferent to the risks posed by the violent and sadistic behavior towards each Plaintiffs that he personally witnessed as described herein.

160.   Rather than stop Deputy Cox from abusing Plaintiffs, Deputy Toledo encouraged Deputy Cox's behavior.

161.   Deputy Toledo's behavior violated Plaintiffs' constitutional right to be free from excessive rigor and caused them physical and emotional harm.

**ELEVENTH CLAIM FOR RELIEF**
**(Against Deputy Walker)**
**(42 U.S.C. § 1983; Violation of Eighth Amendment)**

162.   Deputy Walker was deliberately indifferent to the risks posed by the violent and sadistic behavior towards Plaintiffs the he personally witnessed as described herein.

163.   Rather than stop Deputy Cox from abusing Plaintiffs, Deputy Walker encouraged Deputy Cox's behavior.

164.   Deputy violated Plaintiffs' constitutional right to be free from cruel and unusual punishment and caused them physical and emotional harm.

**TWELFTH CLAIM FOR RELIEF**
**(Against Deputy Walker)**
**(Article I, Section IX of the Utah State Constitution, Excessive Rigor)**

165. Deputy Walker was deliberately indifferent to the risks posed by the violent and sadistic behavior towards Plaintiffs that he personally witnessed as described herein.

166. Rather than stop Deputy Cox from abusing Plaintiffs, Deputy Walker encouraged Deputy Cox's behavior.

167. This behavior by Deputy Walker amounted to violations of Plaintiffs' constitutional right to be free from excessive rigor.

## THIRTEENTH CLAIM FOR RELIEF
### (Against Mr. Toone)
### (42 U.S.C. § 1983; Violation of Eighth Amendment)

168. Mr. Toone was, at a minimum, on constructive knowledge of the policy and practice of allowing sadistic, dangerous behaviors that County policymakers, supervisors, and staff had adopted and implemented at the Jail.

169. Despite knowing of the risk of allowing Jail supervisors and staff to engage in such abusive behavior, Mr. Toone did not take steps to ensure Plaintiffs' safety.

170. Mr. Toone's deliberate indifference to these risks violated Plaintiffs' constitutional right to be free from cruel and unusual punishment.

## FOURTEENTH CLAIM FOR RELIEF
### (Against Mr. Toone)
### (Article I, Section IX of the Utah State Constitution, Excessive Rigor)

171. Mr. Toone was, at a minimum, on constructive knowledge of the policy and practice of allowing sadistic, dangerous behaviors that County policymakers, supervisors, and staff had adopted and implemented at the Jail.

172. Despite knowing of the risk of allowing Jail supervisors and staff to engage in such abusive behavior, Mr. Toone did not take steps to ensure Plaintiffs' safety.

173.   Mr. Toone's deliberate indifference amounted to violations of Plaintiffs' constitutional right to be free from excessive rigor.

## FIFTEENTH CLAIM FOR RELIEF
**(Against Interim Director Haddon and Sheriff Bailey in Their Official Capacities)**
**(42 U.S.C. § 1983; Violation of Eighth Amendment)**

174.   Interim Director Haddon for the Department and Sheriff Bailey for the County, through their predecessors in office, were, at a minimum, on constructive knowledge about the policy and practice of sadistic behavior adopted by Jail supervisors and staff at the times relevant to this complaint.

175.   Despite knowing of the risks of allowing Jail supervisors and staff to engage in such abusive behavior, the Department and County did not take steps to ensure Plaintiffs' safety.

176.   The Department and County were aware of the gross abuse suffered by Plaintiffs while at the Jail but did not take any steps to provide Plaintiffs any medical or psychological assistance.

177.   This behavior by the Department and County amounted to violations of Plaintiffs' constitutional right to be free from cruel and unusual punishment.

178.   The Department and County's continuing failure to properly oversee and supervise the jails where they confine their prisoners leads to an imminent risk of harm.

179.   The Department and County's failure to provide proper medical or psychological care to known victims of abuse leads to an imminent risk of harm.

## SIXTEENTH CLAIM FOR RELIEF
**(Against Interim Director Haddon and Sheriff Bailey in Their Official Capacities)**
**(Article I, Section IX of the Utah State Constitution, Excessive Rigor)**

180. Interim Director Haddon for the Department and Sheriff Bailey for the County, through their predecessors in office, were, at a minimum, on constructive knowledge about the policies of sadistic behavior adopted by Jail supervisors and staff.

181. Despite knowing of the risk of allowing Jail supervisors and staff to engage in such abusive behavior, the Department and County did not take steps to ensure Plaintiffs' safety.

182. The Department and County were aware of the gross abuse suffered by Plaintiffs while at the Jail but did not take any steps to provide Plaintiffs any medical or psychological assistance.

183. This behavior by the Department and County amounted to violations of Plaintiffs' constitutional right to be free from excessive rigor.

184. The Department and County's continuing failure to properly oversee and supervise the jails where they confine their prisoners leads to an imminent risk of harm.

185. The Department and County's failure to provide proper medical or psychological care to known victims of abuse leads to an imminent risk of harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

A. An award of compensatory damages and punitive damages against Daggett County, Sheriff Jorgensen, Lt. Lail, Deputy Cox, Deputy Walker, Deputy Toledo, and Mr. Toone.

B. An award of injunctive relief against Interim Director Haddon and Sheriff Bailey to ensure compliance with the federal and Utah State Constitutions;

C.      An award of reasonable attorney's fees and costs against all Defendants, pursuant

        to 42 U.S.C. § 1988 and any other applicable law; and

D.      An award against all Defendants of any additional relief that the Court deems just

        and proper.

**JURY DEMAND**

Plaintiff requests a trial by jury.

Dated: June 7, 2018

                                        Respectfully submitted,


                                        /s/ John Mejia
                                        John Mejia
                                        Leah Farrell
                                        AMERICAN CIVIL LIBERTIES UNION
                                        OF UTAH FOUNDATION, INC.
                                        355 N. 300 W.
                                        Salt Lake City, Utah 84103
                                        Telephone: 801.521.9862
                                        E-mail: lfarrell@acluutah.org