THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| DUSTIN LAW PORTER, STEVEN DROLLETTE, JOSHUA ASAY, and JOSHUA OLSEN, <br><br> Plaintiffs, <br><br> v. <br><br> DAGGETT COUNTY, UTAH et al., <br><br> Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [126] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:18-cv-00389-DBB <br><br> District Judge David Barlow |

Defendants Daggett County, Sheriff Erik Bailey in his official capacity, and former Sheriff Jerry Jorgensen move for summary judgment on the claims against them.[1] For the reasons stated below, the court GRANTS IN PART and DENIES IN PART the motion.

## BACKGROUND

From 2011 to 2017, Jerry Jorgensen served as Daggett County Sheriff.[2] He also served personally as Jail Commander from 2008 until 2015 before appointing Benjamin Lail as Jail Commander in November or December of 2014.[3] After 2015, Jorgensen visited the jail about once a week and did not frequently interact with inmates or supervise the corrections officers, control room workers, or sergeants at the jail.[4]

---

[1] Daggett County Defendants' Motion for Summary Judgment ("Motion for Summary Judgment") at 2, ECF No. 126, filed Aug. 20, 2021.
[2] Jorgensen Dep. at 6:24–7:1, 10:15–19, ECF No. 141-5.
[3] *Id.* at 10:15–19, 31:25–32:4.
[4] *Id.* at 129:12–130:11; Jorgensen Decl. at ¶ 15.

Lail and another officer, Dale Bingham, were the Taser trainers for Daggett County; they were sent to a third-party Taser training and then returned to Daggett County to train others.[5] Lail and Bingham conducted Taser training for more than ten other officers while they worked at the jail.[6] Daggett County conducted Taser training in January 2016.[7]

Jorgensen knew about the general conditions at the jail and would occasionally hear complaints from officers.[8] Jorgensen "heard rumblings" that guards slept during night shifts at the jail and that guards were watching television during their shifts.[9] In response, he told Lail that that sleeping on the job was not permissible and left Lail to deal with it.[10] Jorgensen also knew that guards would watch television during their shifts.[11] Jorgensen knew that the some of the guards would engage in horseplay and wrestling with each other while at the jail and that in early 2016 Lail "goosed" another officer.[12] Jorgensen characterized the behavior as "boys playing" and recalled that he probably had "the county attorney look at it."[13] Finally, Jorgensen heard a couple of reports of inmates washing officers' personal vehicles.[14] Although the county did not have a policy against inmates washing officers' personal vehicles, Jorgensen "didn't allow it" and "dealt with it informally."[15]

---

[5] Jorgensen Dep. at 49:16–20; Lail Dep. at 38:17–23, ECF No. 141-4.
[6] *Id.* at 143:21–146:14.
[7] UDOC Report at 51, ECF No. 141-28.
[8] *See, e.g.*, Jorgensen Dep. at 43:7–24.
[9] *Id.* at 70:7–15, 71:14–23.
[10] *Id.* at 70:7–15.
[11] *Id.* at 71:14–23.
[12] *Id.* at 94:10–95:3.
[13] *Id.* at 94:24–95:3.
[14] *Id.* at 48:20–49:6.
[15] *Id.*

Joshua Cox was hired as a deputy at the jail in 2015.[16] Cox testified that on his first day working at the jail, Lail told him that "it was a relaxed environment and . . . if [he] needed to take a nap during [his] night shift, that was common practice."[17] Cox saw that it was commonplace for the guards at the jail, including Lail, to hit or pretend to hit each other in the genitals[18] and that Lail "often played around with [Tasers] and acted like he was going to . . . tase the other officers."[19]

Dogs were occasionally present at the jail. A nighttime controller was allowed to bring her dog into the jail control room.[20] Lail would bring his personal dog to work, and the dog would hang out in front of the jail.[21] Cox would bring his police dog into a fenced-in area behind the jail and work on training his dog there.[22] Jorgensen knew that Cox was training his police dog behind the jail.[23]

In April 2016, Jane Doe 2, a teacher who taught inmates at the jail, emailed Jorgensen to inform him about an incident between her and Lail.[24] Doe stated that Lail made "wise-crack comments" while she was on the phone in the jail control room, yelled at her to "[g]et back to class and teach!", and then turned on a Taser and pointed it at the ground directly in front of her feet.[25] She described Lail's behavior as "extremely unprofessional and unacceptable; not to mention intimidating and frightening."[26] Jorgensen responded by calling Lail into his office,

---

[16] Cox Dep. at 5:23–25, ECF No. 141-7.
[17] *Id.* at 12:19–22.
[18] *Id.* at 15:24–16:17.
[19] *Id.* at 17:17–24.
[20] Jorgensen Dep. at 133:2–3.
[21] *Id.* at 133:4–6.
[22] *Id.* at 133:6–10.
[23] *Id.*
[24] ECF No. 141-26 at 1.
[25] *Id.*
[26] *Id.*

telling Lail that the behavior was unacceptable, and asking Lail to apologize to Doe.[27] He characterized the incident as "horseplay."[28] Cox testified that he had heard about the incident between Lail and Doe and had seen Lail act like he was going to tase "just about everybody" at the jail.[29]

Three months later, in July 2016, Brian Thompson, a deputy at the jail, met with Jorgensen to discuss concerns that he had about Lail.[30] Thompson testified that he discussed an incident in which he witnessed Lail hit an inmate in the genitals, incidents of Lail calling inmates names, and occurrences of deputies wrestling with inmates.[31] Thompson also talked to Jorgensen about concerns that Lail had been falsifying his time cards and that jail employees were driving drunk.[32] Thompson stated he was not aware of Jorgensen taking any action after this meeting.[33] Cox also testified that he reported to Deputy Sheriff Chris Collett that he witnessed Lail getting out of his vehicle with an open container but that nothing ever came of his report.[34] Cox stated that Lail later pulled him into his office and said "I know what you did."[35]

On August 27, 2016, during a jail barbeque, Cox tased five inmates in the jail's garage in front of two other deputies, Logan Walker and Rodrigo Toledo.[36] On October 17, 2016, Cox tased inmate Joshua Olsen in the wood shop as an initiation to the work crew, which was required to keep his outside work privileges.[37] There is footage from January 2017 of Cox using

---

[27] Jorgensen Dep. at 33:1–8.
[28] *Id.* at 33:10–12.
[29] Cox Dep. at 19:1–13.
[30] Thompson Dep. at 31:1–7, ECF No. 141-13.
[31] *Id.* at 36:13–23.
[32] UDOC Report at 21.
[33] Thompson Dep. at 36:2–12.
[34] Cox Dep. at 88:1–89:17.
[35] *Id.* at 25:15–26:22.
[36] *Id.* at 78:12–79:17; Walker Decl. at ¶¶ 35-43, ECF No. 141-16; UDOC Report at 1.
[37] ECF No. 141-30 at 4; UDOC Report at 6.

inmates to train his police dog in the jail's chapel.[38] At some point after Adam Gonzalez was appointed sergeant at the jail in January 2017, he heard a report from a jail controller that Cox was having an inmate hold a dog bite guard to train his dog—Gonzalez testified that he told Cox to stop and reported the incident to Lail.[39]

Plaintiff Steven Drollette, a former inmate at Daggett County Jail, wrote a letter to Jorgensen on December 31, 2016 that Jorgensen received on January 10, 2017.[40] The letter alleged serious misconduct by correctional officers at Daggett County Jail, including allegations that Joshua Cox tased inmates.[41] Upon receiving the letter from Drollette, Jorgensen and Collett contacted the Utah Department of Corrections ("UDOC") to request a formal investigation.[42] UDOC began its investigation, and on January 31, 2017 Cox reportedly told inmates in the wood shop not to talk to investigators if anyone asked about anything to do with the tasings.[43] On February 1, 2017, Jorgensen, Collett, and the UDOC investigator agreed that Cox should be placed on administrative leave, and Cox was placed on leave that day.[44]

During the course of the UDOC investigation, the Department of Corrections found evidence of Cox tasing inmates in front of other correctional officers and requiring inmates to participate in training his police dog.[45] Specifically, the report found that on August 27, 2016, "Cox tased inmates without provocation, using a stolen taser," that "Cox also required inmates to

---

[38] UDOC Report at 48.
[39] Gonzalez Dep. at 29:16–36:20, ECF No. 141-10.
[40] Jorgensen Dep. at 55:2–9.
[41] Plaintiffs' Consolidated Opposition to Defendants' Motion for Summary Judgment ("Opposition") at 21, ECF No. 138, filed Oct. 15, 2021.
[42] Jorgensen Dep. at 55:2–9.
[43] UDOC Report at 6.
[44] *Id.* at 8.
[45] *Id.* at 1.

participate in training for his police service dog," and that " Cox was seen on camera assaulting inmates."[46] The report further found "[n]umerous policy violations" and that "[s]ome officers appear to lack appropriate staff/offender boundaries."[47] Finally, the report indicated that some "deputies observed these criminal acts and failed to report them. High ranking jail officers were unaware of many activities occurring within the jail."[48] Ultimately, the "numerous policy and criminal violations uncovered throughout the investigation led to the removal of all Utah State inmates from the Daggett County Jail."[49]

Since the investigation, Cox pled guilty to two counts of aggravated assault, transport of a weapon into a secure area, and theft.[50] Lail pled guilty to one count of reckless endangerment.[51] Jorgensen entered a guilty plea in abeyance for one count of official misconduct.[52] Jorgensen's plea admits: "On or about January 2014 through April 2017; [I] did, with the intent to benefit myself or another, knowingly refrain from performing a duty imposed on me by law or clearly inherent in the nature of my office as Daggett County Sheriff."[53] The plea goes on to state that Jorgensen "failed to investigate, discipline, or otherwise supervise deputies under his control, and failed to investigate criminal conduct that occurred at the Daggett County Jail."[54] Daggett County has not operated a jail since April 2017.[55]

---

[46] *Id.*
[47] *Id.* at 2.
[48] *Id.*
[49] *Id.*
[50] ECF No. 141-30 at 15–16.
[51] ECF No. 141-21 at 1.
[52] ECF No. 141-25 at 2.
[53] *Id.*
[54] *Id.*
[55] Motion for Summary Judgment at 3; Opposition at 5.

Plaintiffs Porter, Drollette, Asay, and Olsen—former prisoners at Daggett County Jail—brought this civil-rights suit against Daggett County; Utah Department of Corrections Director Mike Haddon in his official capacity; current Daggett County Sheriff Eric Bailey in his official capacity; caseworker Jeffery Toone in his official capacity; and Jorgensen, Cox, Lail, Walker, and Toledo in their personal capacities. Plaintiffs' allegations include that Cox tased all four of them[56] and that Cox forced Porter, Drollette, and Olsen to participate in training his dog and ordered his dog to attack them.[57]

All defendants except Daggett County, Bailey, and Jorgensen have either defaulted, settled, or been dismissed. The three remaining defendants have moved for summary judgment on the claims against them.

**STANDARD**

A court grants summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[58] Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of any party."[59] The moving party is also entitled to summary judgment if "the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[60] Both evidence and reasonable inferences drawn from that evidence are construed in the light most favorable to the nonmovant.[61]

---

[56] Amended Complaint at ¶¶ 51–60, 103–07, ECF No. 3, filed June 7, 2018; Asay Complaint at ¶¶ 64–66, ECF No. 2, No. 2:18-cv-422, filed May 30, 2018; Olsen Amended Complaint at ¶ 39, ECF No. 14, No. 2:19-cv-188, filed June 4, 2019. Cases consolidated on March 1, 2021. *See* Order to Consolidate, ECF No. 113.
[57] Amended Complaint at ¶¶ 64–67, 100–02; Olsen Amended Complaint at ¶ 48.
[58] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[59] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[60] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[61] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**DISCUSSION**

The court will address whether summary judgment is appropriate for each of the three

remaining Defendants with respect to the Eighth Amendment claims before turning to examine

the Utah state constitutional claims.

## I. Erik Bailey is entitled to summary judgment because the claims against him in his official capacity are duplicative of the claims against Daggett County.

In general, an official-capacity suit under § 1983 is, "in all respects other than name, to

be treated as a suit against the entity."[62] As such, any claims against Bailey in his official

capacity as the current Sheriff of Daggett County are duplicative of Plaintiffs' claims against

Daggett County.[63] To the extent that Plaintiffs request an award of injunctive relief against

Bailey,[64] it is an undisputed fact that Daggett County has not operated a jail since April 2017.[65]

Accordingly, any equitable claims against Bailey in his official capacity are not merely

subsumed in the claims against Daggett County, but also moot. Bailey is granted summary

judgment.

## II. Jerry Jorgensen is entitled to qualified immunity because Plaintiffs have not shown that his actions violated clearly established law.

When considering Jorgensen's constitutional liability, the court must determine if

Jorgensen is entitled to qualified immunity. Qualified immunity shields officers from civil

liability so long as their conduct "does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."[66] When an officer raises a defense of

---

[62] *Moss v. Kopp*, 559 F.3d 1155, 1168 n. 13 (10th Cir. 2009) (citing *Kentucky v. Graham*, 473 U.S. 159, 161, 165–66 (1985)).
[63] *See* Amended Complaint at ¶¶ 136–141, 174–85.
[64] *Id.* at 25 (requesting an "award of injunctive relief against . . . Sheriff Bailey to ensure compliance with the federal and Utah State Constitutions.").
[65] Motion for Summary Judgment at 3; Opposition at 5.
[66] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

qualified immunity, "the burden shifts to the plaintiff to show that the defendant is not entitled to that immunity."[67]

Officers are entitled to qualified immunity under § 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"[68] The court has the discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first.[69] Here, the court will first examine whether Jorgensen's conduct was clearly established as unlawful under federal law.

For an officer's conduct to be "clearly established" as unlawful, "at the time of the officer's conduct, the law [must be] sufficiently clear that every reasonable official would understand that what he is doing is unlawful."[70] Existing precedent must have placed the constitutionality of an officer's conduct "beyond debate."[71] Essentially, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"[72]

The Supreme Court has instructed lower courts not to define clearly established law at too high a level of generality.[73] The Court teaches that "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[74] As such,

---

[67] *Pyle v. Woods*, 874 F.3d 1257, 1262 (10th Cir. 2017) (quoting *Douglas v. Dobbs*, 419 F.3d 1097, 1100 (10th Cir. 2005)).
[68] *District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).
[69] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).
[70] *Id.* (internal quotations and citations omitted).
[71] *Id.*
[72] *City of Tahlequah v. Bond*, 595 U.S. ___, 142 S. Ct. 9, 11 (2021) (per curiam) (quoting *Wesby*, 138 S. Ct. at 589).
[73] *See, e.g.*, *Bond*, 142 S. Ct. at 11 (overturning the Tenth Circuit's denial of qualified immunity); *Kisela v. Hughes*, 584 U.S. ___, 138 S. Ct. 1148, 1152 (2018); *Wesby*, 138 S. Ct. at 590; *White v. Pauly*, 580 U.S. ___, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).
[74] *Bond*, 142 S. Ct. at 11 (quotations omitted).

Plaintiff must identify a case that demonstrates that an officer's conduct is unlawful with "a high degree of specificity."[75] The Tenth Circuit has stated that to make a showing of clearly established law, "the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[76]

Plaintiffs allege that Jorgensen violated the Eighth Amendment and the Utah Constitution when he was "deliberately indifferent to the kinds of abuse against the Plaintiffs," and that "[d]espite knowing the risks of harm to the prisoners from these abusive behaviors, Sheriff Jorgensen allowed Jail supervisors and staff to continue them."[77] In order to defeat Jorgensen's defense of qualified immunity, Plaintiffs must show that Jorgensen's actions were clearly established as unlawful by identifying a case in which a defendant "acting under similar circumstances" as Jorgensen was held to have violated the Eighth Amendment.[78]

Plaintiffs first cite to *Hudson v. McMillian*[79] and *Whitley v. Albers*[80] to argue that, at the time of Jorgenson's alleged constitutional violations, it was clearly established that the Plaintiffs had a right "to be free from malicious and sadistic harm . . . from dogs as well as from tasers."[81] But both *Hudson* and *Whitley* involved claims against prison officials who personally physically harmed the plaintiffs, gave orders to harm a plaintiff, or were present while guards assaulted a

---

[75] *Wesby*, 138 S. Ct. at 590.
[76] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (quoting *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020)).
[77] Amended Complaint at ¶¶ 143–44, 146–47.
[78] *White,* 137 S. Ct. at 552.
[79] 503 U.S. 1 (1992).
[80] 475 U.S. 312 (1986).
[81] Motion for Summary Judgment at 61.

plaintiff.[82] By contrast, there is no evidence of record that Jorgensen knew that any prisoner actually had been tased or bitten by a dog, much less that he had participated in, ordered, or was present for the assaults. As such, *Hudson* and *Whitley* do not meet the high bar of specificity required to clearly establish that Jorgensen's actions were unconstitutional.

Next, Plaintiffs cite to a litany of cases from outside of the Tenth Circuit that hold that the unjustified use of Tasers against inmates is a violation of the Eighth Amendment.[83] But again, these cases hold that assaulting prisoners or directing officers to assault prisoners with Tasers is unconstitutional—they do not address whether conduct such as Jorgensen's is an Eighth Amendment violation. Thus, even supposing that case law outside of the Tenth Circuit could create clearly established law in the Tenth Circuit, these cases are insufficiently particularized to the case at hand to defeat Jorgensen's qualified immunity.

Plaintiffs do identify some Tenth Circuit cases in which a supervisor was constitutionally liable even though the supervisor himself did not engage in malicious conduct, but these cases are insufficiently particularized to clearly establish Jorgensen's conduct as unlawful. First, in *Gonzalez v. Martinez*, the Tenth Circuit reversed the district court's grant of summary judgment where there was a genuine issue of material fact as to whether a Sheriff had ignored inmate

---

[82] *Hudson*, 503 U.S. at 997–98; *Whitley*, 475 U.S. at 314–16.
[83] Opposition at 61–62 (citing *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) (holding that use of a Taser against an inmate violated the Eighth Amendment); *Shelton v. Angelone*, 183 F. Supp. 2d 830, 835 (W.D. Va. 2002); *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009) (finding that a guard who used a Taser against an inmate was not entitled to qualified immunity); *Rodriguez v. Cty. of Los Angeles*, 891 F.3d 776, 796–97 (9th Cir. 2018) (finding that deputies that tased inmates and officers who gave deputies orders to tase inmates were not entitled to qualified immunity); *Brooks v. Johnson*, 924 F.3d 104, 119 (4th Cir. 2019) (finding that it is clearly established that a corrections officer's use of a Taser in bad faith violates an inmates Eighth Amendment right)). Of these cases, only *Rodriguez* found that a municipality or sheriff's department could be liable for tasings. *Rodriguez*, 891 F.3d at 803. There, the court specifically noted that "[t]here was substantial evidence of repeated constitutional violations, of [the sheriff department's] awareness of those violations, and of [the department's] failure to take ant remedial action. *Id.* Here, there is no evidence that Jorgensen was aware that inmates had been tased.

reports of sexual assault and disregarded an excessive risk to inmate safety.[84] *Gonzalez* is not enough to defeat Jorgensen's qualified immunity. In *Gonzalez*, there was a record of "physical assaults on inmates set against the facts of [a] Sheriff['s] knowledge of reported risks to inmate health or safety, including the documented lapse of security in the control room [and] complaints of sexual harassment and intimidation. . . ."[85] Here, Plaintiffs have identified no facts suggesting that Jorgensen had personal knowledge of malicious use of Tasers and dogs on inmates at the jail until he received Drollette's letter. Additionally, once he received Drollette's letter, Jorgensen contacted the Utah Department of Corrections to request a formal investigation.[86] Accordingly, the facts of *Gonzalez* are not specific enough to the current case to create clearly established law such that every reasonable official in Jorgensen's position would have known his actions to be unlawful.

Plaintiffs also cite *Keith v. Koerner*, a case in which the Tenth Circuit reversed the district court's grant of summary judgment to a prison warden on qualified immunity grounds.[87] There, the court noted that "it is clearly established that a prison official's deliberate indifference to sexual abuse by prison employees violates the Eighth Amendment" and that where there was "evidence of limited investigation and lax discipline for both undue familiarity and sexual misconduct" and evidence of "the inadequate investigation of the sexual misconduct allegations against [prison officers]," the warden was not entitled to qualified immunity.[88]

---

[84] *Gonzalez v. Martinez*, 403 F.3d 1179, 1187 (10th Cir. 2005).
[85] *Id.*
[86] Collett Decl. at ¶¶ 28–29, ECF No. 128.
[87] *Keith v. Koerner*, 843 F.3d 833, 852 (10th Cir. 2016).
[88] *Id.* at 849–50.

*Keith* is also insufficiently particularized to the facts of this case to defeat Jorgensen's qualified-immunity defense. In *Keith*, there was evidence of 43 sexual misconduct investigations and that Koerner "failed to reasonably respond" to these numerous incidents.[89] In this case, Jorgensen was only once presented with evidence of misconduct directed at inmates before he received the Drollette complaint—Thompson came to Jorgensen to complain that Lail had hit an inmate in the genitals, that Lail was calling inmates names, and that deputies were wrestling with inmates.[90] *Keith*'s denial of qualified immunity for a warden on notice of numerous sexual misconduct allegations would not cause "every reasonable official" to understand that a failure to better supervise, investigate and discipline after a single report of misconduct directed toward inmates was clearly unlawful.[91]

The other issues at the jail that Jorgensen knew of before receiving the Drollette complaint were guards sleeping and watching TV on-duty, guards engaging in horseplay with each other, inmates washing officer's personal cars, and the incident between Lail and Doe in which Lail turned his Taser on and pointed it at the ground in front of Doe's feet.[92] While these reports support the need for improved supervision, investigation, and discipline, they are too different from the facts of *Keith* to place the constitutionality of Jorgensen's deficient supervision "beyond debate."[93] Thus, in light of the high standard for identifying particularized case law, a reasonable jury could not find that "every reasonable official" in Jorgensen's position

---

[89] *Id.* at 843.
[90] Thompson Dep. at 36:19–23.
[91] *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).
[92] *See* sources cited *supra*, notes 8–32.
[93] *Ashcroft*, 563 U.S. at 735.

would understand what he was doing or failing to do was unlawful. Accordingly, *Keith* is not sufficient to defeat Jorgensen's qualified-immunity defense.

Plaintiffs also cite to several district court cases that have held that a sheriff is liable as a supervisor for officer misconduct.[94] In one of these cases the district court granted summary judgment to the defendants because, among other things, there was "no evidence by which a reasonable jury could find that [the Sheriff] set in motion a series of events that he 'knew or reasonably should have known' would cause [the deputy] to deprive [plaintiffs] of their constitutional rights."[95] In the other, the court denied summary judgment where the supervisor knew of past sexual assault allegations against a deputy but decided to hire him anyway.[96] In this case, Jorgensen was presented with no evidence of Tasers or dogs being used on inmates when he decided to hire Cox or before he received the Drollette complaint. Furthermore, these cases are insufficient to create clearly established law for the purposes of defeating qualified immunity because the plaintiff must point to Supreme Court precedent, Tenth Circuit precedent, or a clear weight of authority from other circuits as a source of clearly established law.[97]

In sum, at the time the conduct occurred it was not clearly established that Jorgensen's actions were unlawful. Plaintiffs have not identified a Supreme Court or Tenth Circuit case—or the weight of authority from other circuits—with sufficiently particularized facts such that every

---

[94] *See J.L.C. v. McKinney*, No. CIV-11-683-C, 2014 WL 4145550, at *2 (W.D. Okla. Aug. 19, 2014) (denying summary judgment where the defendant knew of a sexual misconduct allegation against a deputy when the defendant made the decision to hire the deputy); *Sigg v. Allen Cty.*, No. 15-CV-01007-EFM, 2016 WL 6716085, at *9 (D. Kan. Nov. 2016) (finding that "there is no evidence by which a reasonable jury could find that [a Sheriff] set in motion a series of events that he 'knew or reasonably should have known' would cause [a deputy] to deprive [plaintiffs] of their constitutional rights.").
[95] *Sigg*, 2016 WL 6716085, at *9.
[96] *J.L.C.*, 2014 WL 4145550, at *2.
[97] *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021).

14

reasonable officer in Jorgensen's position would understand that his actions were unlawful, and the court is not aware of any. The question is not simply whether it was established that inmates have a right to be free from unwarranted tasings and dog bites, but whether Jorgensen's own actions or inactions were such that "every reasonable official would understand that what he is doing is unlawful"[98] and that the unconstitutionality of Jorgensen's conduct was "beyond debate."[99] No sufficiently particularized case establishes that. As such, Jorgensen is entitled to qualified immunity, and the motion for summary judgment is granted on the claims against him.

### III. Daggett County is entitled to summary judgment on Plaintiffs' Eighth Amendment claims for failure to train but not on Plaintiffs' claims for failure to supervise.

A municipality or local government may be liable under 42 U.S.C. § 1983 for its own illegal acts, but it is not vicariously liable for its employees' actions.[100] To impose liability on a local government, plaintiffs must prove that "action pursuant to official municipal policy" caused their injury.[101] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[102] During the relevant time period in this case, Jorgensen was a final policymaking official for the County because he was the sheriff.[103]

To establish municipal liability under § 1983, a plaintiff must demonstrate three things. First, a plaintiff must identify a "municipal policy or custom."[104] An official policy or custom may take one of the following forms:

---

[98] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).
[99] *Id.*
[100] *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 692 (1978)).
[101] *Id.*
[102] *Id.* at 61.
[103] Motion for Summary Judgment at 18 (citing Utah Code Ann. § 17-22-4(1)).
[104] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019).

(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.[105]

In this case, Plaintiffs rely on the fifth example of a municipal policy or custom, the "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused."[106]

Second, a plaintiff must demonstrate "a direct causal link between the policy or custom and the injury alleged."[107] "To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'"[108] This requirement is satisfied if the plaintiff shows that "the municipality was the moving force behind the injury alleged."[109] "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring."[110]

Finally, for claims of inadequate hiring, training, or other supervisory practices, a plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."[111] "Deliberate indifference is a stringent standard of

---

[105] *Id.* (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

[106] *Id.*

[107] *Id.* at 1284.

[108] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).

[109] *Bd. of Cty. Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997).

[110] *Schneider*, 717 F.3d at 770.

[111] *Id.* (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). In their opposition, Plaintiffs appended and referenced the declaration of Margo Frasier. *See* Frasier Decl., ECF No. 141-17. In their Reply, Defendants argue that the court should strike the report because Ms. Frasier was not identified as a witness, has not been subject

fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[112]

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. Deliberate indifference may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.[113]

Here, Plaintiffs allege that Daggett County is liable for failing to properly train jail staff and failing to supervise and discipline jail staff.[114] The court will address these claims in turn.[115]

### A.  Failure to Train

Plaintiffs argue that Daggett County is liable for Jorgensen's failure to properly train jail staff.[116] The Tenth Circuit has held that "a supervising prison official may be liable 'where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable.'"[117] "It is not enough to allege 'general deficiencies' in a particular training program. . . . Rather, a plaintiff 'must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the

---

to cross-examination, and is not qualified under Federal Rule of Evidence 702. Daggett County Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Reply") at 19–20, ECF No. 152, filed Nov. 24, 2021. The court reserves its ruling on whether Ms. Frasier may testify at trial, but has not cited the disputed declaration here because it did not assist the court in its summary judgment determination.

[112] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[113] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (internal citations and quotations omitted).

[114] *See* Opposition at 51–56.

[115] In their argument for Jorgensen's personal liability, Plaintiffs also argue that Jorgensen failed to hire "qualified staff when he promoted Benjamin Lail to Jail Commander." *Id.* at 55. But Plaintiffs do not argue in their briefing that the alleged failure to hire is a potential source of liability for Daggett County on the facts of this case, nor do they supply any cases supporting that prospect on facts like the ones here. *See id.* at 55–56.

[116] Opposition at 51–53.

[117] *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (quoting *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991) (alteration in original).

deficiency in training actually caused the jailer to act with deliberate indifference to his safety.'"[118] And the Supreme Court has made it clear that a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."[119]

Plaintiffs broadly allege various training failures, including Taser use, use of force, code of conduct, and reporting misconduct, though they sometimes lump these allegations together with failure to supervise allegations.[120] Regarding the failures to provide a code of conduct and misconduct reporting training, Plaintiffs do not explain how those failures were "closely related to [their] ultimate injury" and that the deficiencies "actually caused the jailer to act with deliberate indifference."[121] Simply noting one or more general deficiencies is insufficient as a matter of law.

The disputed absence of use of force and Taser policies,[122] as well as allegedly inadequate Taser training,[123] present a somewhat closer question. However, the record indicates that Daggett County conducted Taser training in January 2016, some months before the tasings in question.[124] Furthermore, Plaintiffs have not identified a "specific deficiency" in Daggett County's Taser training program or presented evidence that would allow a reasonable jury to find that the specific deficiency caused Cox to tase inmates or that a possible lack of a use of

---

[118] *Id.* at 838–39 (alterations in original).
[119] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).
[120] Opposition at 51–53, 64-67.
[121] *See Keith*, 843 F.3d at 838.
[122] Defendants claim that there were appropriate Taser and use of force policies in place at the time Cox tased inmates. Collett Decl. at ¶ 22 ("Deputy Cox directly violated [the Taser policy] by tasing the Plaintiffs."). But Plaintiffs note that Collett, as Daggett County representative, did not know when the use of force and Taser policies went into effect. *See* Opposition at 52; Daggett County 30(b)(6) Dep. at 9:2–16, ECF No. 141-11 ("Unless there's a date attached to [the Taser policy], I do not know [when it went into effect].."). As such, there is a genuine dispute of material fact about when the Taser policy went into effect, but this dispute does not impact the court's analysis on Plaintiffs' claim for failure to train.
[123] *Id.*
[124] UDOC Report at 51.

force policy caused Cox to have his dog bite Plaintiffs. The record suggests that the deputy (Cox) who tased the Plaintiffs already knew his conduct was inappropriate—for example, he used the Taser on the Plaintiffs in the garage where the surveillance cameras did not work[125] and in the wood shop where there were no cameras.[126] And when his conduct was discovered, he reportedly told the inmates not to say anything.[127] So the record evidence does not suggest that Cox needed more training because he was unaware that what he was doing was wrong: it is that he already knew it was wrong and chose to do it anyway. It is similarly obvious that a deputy should not allow or cause his dog to bite an inmate without cause, and Plaintiffs do not explain how the lack of training actually "caused the jailer to act with deliberate indifference."[128]

Plaintiffs analogize to the hypothetical discussed by the Supreme Court in footnote 10 of *City of Canton v. Harris*.[129] There, the Court noted that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."[130] The Court gave the example of a city, knowing to a certainty that it will arm its police officers with firearms and that their officers will be required to arrest fleeing felons, failing to train its officers in the constitutional limitations on the use of deadly force.[131] Plaintiffs contend that this is comparable to Jorgensen's failure to provide adequate Taser training because it was

---

[125] *See* Toledo Dep. at 113:10–23, ECF No. 141-6; Walker Decl. at ¶ 62, ECF No. 141-16.
[126] UDOC Report at 48.
[127] *Id.* at 6.
[128] *See Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016).
[129] 489 U.S. 378, 390 n.10 (1989).
[130] *Id.* at 390.
[131] *Id.* at 390 n.10.

predictable that the lack of training would result in the officers at the jail violating Plaintiffs' constitutional rights.[132]

This case is distinct from the hypothetical posed by the Court in *Canton*. There, the Court posited that if the need for training was so obvious and a municipality failed to provide it, that could potentially satisfy the deliberate indifference standard. But here, Daggett County did provide Taser training.[133] Plaintiffs have not pointed to a specific deficiency that was closely related to their injury and caused the jailer to act with deliberate indifference.

In sum, while more training theoretically might have made it less likely that Cox would assault inmates, Plaintiffs simply do not show a basis for the legally required "specific deficiency" that was "closely related to [the] ultimate injury." [134] The record also does not reasonably support a finding that "the deficiency in training actually caused the jailer to act with deliberate indifference to his safety."[135] The "direct causal link,"[136] which the court is directed to apply with "especial rigor," is missing.[137] Accordingly, Daggett County is entitled to summary judgment on this claim.

### B.  Failure to Supervise and Discipline

Plaintiffs also argue that Daggett County is liable for Jorgensen's failure to supervise and discipline jail staff.[138] As noted previously, for Plaintiffs' claim to survive summary judgment a reasonable jury must be able to find: (1) that Daggett County had an official policy or custom;

---

[132] Opposition at 65–66.
[133] UDOC Report at 51.
[134] *Keith v. Koerner*, 843 F.3d 833, 838–39 (10th Cir. 2016) (alterations in original).
[135] *Id*.
[136] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).
[137] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).
[138] Opposition at 53–55.

(2) that there is a direct causal link between the official policy or custom and the injury alleged; and (3) that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences.[139] The court will address these elements in turn.

### 1.  Official Policy or Custom

This requirement is not in dispute.[140] As explained above, Plaintiffs rely on the fifth example of a municipal policy or custom, the "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused."[141] Jorgensen was a final county policymaker because he was the County Sheriff at the time of the injuries in question.[142] Because Plaintiffs argue that Jorgensen's failure to supervise and discipline jail staff caused their injuries, a reasonable jury could find that, so long as Plaintiffs establish that Jorgensen was deliberately indifferent to their injuries, Plaintiffs have also demonstrated an official municipal policy or custom. As such, the court proceeds to examine the next elements.

### 2.  Causation

Next, for this case to go to trial, a reasonable jury must be able to find "a direct causal link between the policy or custom and the injury alleged."[143] The policy or practice must be "closely related to the violation of the plaintiff's federally protected right.'"[144] This occurs when

---

[139] *Schneider*, 717 F.3d at 769.

[140] Motion for Summary Judgment at 18 (noting that "Sheriff Jorgensen was the final policymaker regarding jail policy issues for the County"). Although Defendants argue that "Plaintiffs fail to identify a constitutionally defective policy or training that the Sheriff implemented," *id.*, this argument is more appropriately addressed when considering causation and deliberate indifference, as an official policy can be "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Schneider*, 717 F.3d at 769.

[141] *Id.*

[142] Motion for Summary Judgment at 18 (citing Utah Code Ann. § 17-22-4(1)).

[143] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).

[144] *Schneider*, 717 F.3d at 770.

"the municipality was the moving force behind the injury alleged."[145] Because inadequate

supervision and discipline are at issue, the "causation element is applied with especial rigor."[146]

Cox, the officer who allegedly tased Plaintiffs, gave testimony relevant to supervision at

the jail. Cox testified that, on his first day at the Daggett County Jail, Jail Commander Lail told

him that "it was a relaxed environment and . . . if [he] needed to take a nap during [his] night

shift, that was common practice."[147] Cox testified that it was common for officers, including

Lail, to hit each other in the genitals[148] and that Lail "often played around with [Tasers] and

acted like he was going to . . . tase the other officers."[149] Cox had seen Lail act like he was going

to Tase "just about everybody" at the jail and had heard about the incident between Lail and Jane

Doe 2,[150] but had never heard of anyone ever being written up for playing with Tasers.[151] Cox

also testified that once he had observed Lail getting out of his vehicle with an open container and

had reported the incident to Collett, but then Lail pulled [Cox] into his office and said, 'I know

what you did,'" and that nothing happened to Lail.[152] Ultimately, Cox testified that he

"believe[d] that if the leadership [at Daggett County Jail] was stronger, it would have been

harder for [him] to do the things [he did]"[153] because:

> There was just a lack of leadership. There wasn't a whole lot of accountability.
> Nobody was really held accountable for the things that they did there. And with the
> culture being the way it was, horseplay was prevalent throughout the whole jail.[154]

---

[145] *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).
[146] *Schneider*, 717 F.3d at 770.
[147] Cox Dep. at 12:19–22.
[148] *Id.* at 15:24–16:17.
[149] *Id.* at 17:17–24.
[150] *Id.* at 19:1–13.
[151] *Id.* at 19:21–24.
[152] *Id.* at 25:15–26:22.
[153] *Id.* at 36:6–8.
[154] *Id.* at 36:10–14.

To be sure, some of these supervisory failings are too attenuated to meet the rigor required for causation. For example, officers sleeping during the night shift is both inappropriate and evidence of poor supervision, but it does not directly lead to inmates being tased. Similarly, that Lail, the jail supervisor, allegedly had an open container in his vehicle was certainly wrong and would undermine his authority, but it did not directly cause inmates to be assaulted. And a general "lack of leadership" is plainly insufficient too. More pertinent is the testimony that Cox knew of Lail's misconduct with Tasers, both with other jail staff in sparking Tasers near them and acting like he was going to tase them, as well as with the visiting teacher, Doe, at whose feet Lail pointed his Taser after yelling at her. Cox has testified that he viewed Lail's conduct and his own later Taser misconduct as "essentially the same thing."[155]

Lail was Jorgensen's handpicked jail commander. Jorgensen himself has testified that he did little to supervise others at the jail: At the time in question, Jorgensen did not frequently interact with inmates or supervise the corrections officers, control room workers, or sergeants at the jail.[156] Prior to the UDOC investigation, Cox only recalled even seeing Jorgensen at the jail once.[157] And Jorgensen himself pled guilty to criminal official misconduct on the basis that he failed "to investigate, discipline, or otherwise supervise deputies under his control, and failed to investigate criminal conduct that occurred at the Daggett County Jail."[158] Finally, Jorgensen testified that the County did not provide him "the money to have the kind of supervision we

---

[155] *Id.* at 38:1–25.
[156] Jorgensen Dep. at 129:12–130:11; Jorgensen Decl. at ¶ 15.
[157] Cox Dep. at 51:10–18.
[158] ECF No. 141-25 at 2.

needed round the clock" and that because that supervision was not provided: "the fox was let around in the hen house a little bit."[159]

Viewing the foregoing evidence and the reasonable inferences therefrom in the light most favorable to the nonmoving party,[160] a reasonable jury could find that Jorgensen's lack of supervision and discipline at the jail was the "moving force" behind the Plaintiffs' injuries. Cox arrived at the jail and was immediately exposed to a "relaxed environment" where the Sheriff was not present and the jail commander and Taser trainer felt that it was appropriate to hit other guards in the genitals and treat Tasers like toys. Cox also knew of the Taser incident between Lail and Jane Doe 2 and had not heard that Lail received any discipline for his misconduct. Additionally, when Cox tried to report Lail's misconduct, Lail faced no consequences. A jury could reasonably credit Cox's testimony regarding the Taser misconduct: "The same thing I was observing was the things [sic] I was enacting."[161] While not all of the supervisory failures could meet the rigorous causation standard, the jail commander's known Taser misconduct, Jorgensen's testimony that he had insufficient funds for supervision, Cox' testimony regarding what influenced him, and Jorgensen's guilty plea regarding his failure "to investigate, discipline, and otherwise supervise" could be enough for a reasonable jury to find causation.

### 3. Deliberate Indifference

Finally, for this case to go to trial, a reasonable factfinder would have to be able to determine that Jorgensen had actual or constructive notice that his actions or failures to act were "substantially certain" to result in an assault perpetrated against an inmate and that he

---

[159] Jorgensen Dep at 127:23–25, 128:1–5.
[160] *Scott v. Harris*, 550 U.S. 372, 378 (2007).
[161] Cox Dep. at 38:7–11.

deliberately chose to disregard that harm.[162] That notice usually involves a pattern of unconstitutional behavior, but it also can be enough if a violation of federal rights was "highly predictable" or a "plainly obvious" consequence of Jorgensen's actions or inaction.[163] "Deliberate indifference is a stringent standard of fault."[164]

In analyzing whether a jury could find that Jorgensen was deliberately indifferent to Plaintiffs' constitutional rights, the court begins with what a factfinder might determine Jorgensen knew about prior to the inmate assaults at issue here. First, Jorgensen knew in April 2016 that Lail—Jorgensen's jail commander and Taser trainer—had sparked a Taser at jail teacher Jane Doe 2 and pointed the Taser at the ground directly in front of her feet.[165] Jorgensen testified that he thought of this incident as "horseplay."[166] In response to this incident Jorgensen told Lail that his behavior was unacceptable and told him to apologize to Doe.[167]

Next, Deputy Brian Thompson testified that about two months later in July 2016 he had a discussion with Jorgensen about several concerns he had with Lail's behavior.[168] Thompson testified that he talked to Jorgensen about his concerns with Lail hitting an inmate in the genitals, Lail calling inmates names, and deputies wrestling with inmates.[169] Thompson testified that Jorgensen said he was going to talk to Lail, but Thompson "felt like [Jorgensen] was dismissive"

---

[162] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).
[163] *Id.*
[164] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).
[165] ECF No. 141-26 at 1.
[166] Jorgensen Dep. at 106:24–107:1.
[167] *Id.* at 107:2–10. Lail later pled guilty to reckless endangerment for sparking a Taser at Doe. *See* ECF No. 141-21 at 2.
[168] Thompson Dep. at 31:1–7.
[169] *Id.* at 36:13–23.

and that Jorgensen said "something to the effect of, I don't know why you're saying these things."[170]

Additionally, Jorgensen himself has testified that he did not have enough money for supervisors. Specifically, he testified that if had more money "for the kind of supervision we needed" that "would solve all of that problem."[171] If he had more money and enough supervisors "it could have prevented [Cox tasing the inmates]."[172]

Finally, as noted earlier, Jorgensen eventually entered a guilty plea in abeyance to official misconduct.[173] The plea states that Jorgensen "[d]id, with the intent to benefit [him]self or another, knowingly refrain from performing a duty imposed on [him] by law or clearly inherent in the nature of [his] office as Daggett County Sherriff."[174] The plea also states:

> On or about January 2014 through April 2017, JERRY RULON JORGENSEN, defendant, failed to investigate, discipline, or otherwise supervise deputies under his control, and failed to investigate criminal conduct that occurred at the Daggett County Jail.[175]

Considering all the evidence of record, and viewing it and the reasonable inferences therefrom in the light most favorable to the nonmoving party,[176] a reasonable jury could find that Jorgensen had notice that his actions or failures to act were "substantially certain" to result in an assault perpetrated against an inmate and that he deliberately chose to disregard that harm.[177] Jorgensen himself did little to supervise jail staff, having delegated that role to his jail

---

[170] *Id.* at 31:10–15, 17–23.
[171] Jorgensen Dep. at 127:22–128:5.
[172] *Id.* at 128:22–25.
[173] ECF No. 141-25 at 1–2.
[174] *Id.* at 2.
[175] *Id.*
[176] *Scott v. Harris*, 550 U.S. 372, 378 (2007).
[177] *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019).

commander, Lail.[178] About four months before Cox tased the Plaintiffs, Jorgensen knew that Lail

had pointed an active Taser at a teacher's feet at the jail.[179] Approximately two months later,

Jorgensen was informed by another deputy that Lail had tapped an inmate in the genitals, was

calling inmates names, and may have been falsifying time cards, which would be relevant to the

amount of time actually spent supervising. Jorgensen also believed he did not "have the kind of

supervision that we needed round the clock."[180] Jorgensen later would plead guilty to official

misconduct, where he admitted that he knowingly "failed to investigate, discipline, or otherwise

supervise deputies under his control."[181]

      The standard for deliberate indifference is stringent. It is an unusual fact pattern that

permits a factfinder to determine that a policymaker's actions or inaction make a constitutional

violation "substantially certain" or a "highly predictable" or "plainly obvious" consequence of

their action or inaction. The courts are instructed to take care that the evidentiary record actually

can meet those high standards, so that a county or municipality is not simply held vicariously

liable for the acts of its employees.

      But this is an unusual case. While many § 1983 prison cases involve alleged crimes by

employees, this is a case in which a policymaker, Sheriff Jorgensen, eventually pleaded guilty to

a crime involving knowingly failing to investigate, discipline, or otherwise supervise deputies

under his control. There is record evidence that the Sheriff knew his handpicked jail commander

---

[178] Jorgensen Dep. at 129:12–130:11.
[179] *See* ECF No. 141-26.
[180] Jorgensen Dep. at 127:22–128:5.
[181] ECF No. 141-25 at 2. Defendants argue that "Jorgensen's plea does not state with any specificity what events he failed to investigate, what deputies he failed to investigate, or what crimes he failed to investigate . . . it is too ambiguous and vague to defeat summary judgment." Reply at 13. But it is precisely this factual ambiguity that could allow a reasonable jury to determine that Jorgensen had knowledge that his failure to supervise and discipline would cause Plaintiffs' injuries.

was involved in Taser misconduct. There also is evidence that the Sheriff knew that the same jail commander was involved in other physical and non-physical misconduct with inmates. And the Sheriff knew he was short on supervisory staff generally. Of course, Plaintiffs face a heavy burden, but viewed in the light most favorably to them, the record evidence could allow a reasonable factfinder to determine that Sheriff Jorgensen was deliberately indifferent to their constitutional rights because his supervisory failures, which he later admitted were knowing and criminal, made it substantially certain that they would be assaulted.

In sum, Daggett County is not entitled to summary judgment on Plaintiff's claims that the County failed to adequately supervise and discipline its employees. A reasonable jury could find that there was an official policy or custom of failing to supervise and discipline Daggett County deputies, that the policy was the moving force behind the assaults that Plaintiffs suffered, that Jorgensen, the policymaking official, had notice that his actions were substantially certain to result in an assault perpetrated against an inmate, and that he deliberately chose to disregard that harm. Daggett County's motion for summary judgment is denied on these claims, though it is granted on the failure to train claims for the reasons previously stated.

### IV. Defendants are entitled to summary judgment on Plaintiffs' Utah state constitutional claims because a reasonable factfinder could not find that Jorgensen or Daggett County flagrantly violated Plaintiffs' state constitutional rights.

Plaintiffs also bring an Unnecessary Rigor claim under Article I, Section 9 of the Utah state constitution as an alternative to their federal constitutional claims.[182] To obtain damages for a state constitutional violation, a plaintiff must show: "(1) that he or she suffered a flagrant

---

[182] *See* Utah Const. art. I, § 9 ("Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.").

violation of his or her constitutional rights; (2) that existing remedies do not redress his or her injuries; and (3) that equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries."[183]

To show that plaintiffs have suffered a "flagrant" violation of his or her constitutional rights, they must demonstrate "that a defendant must have violated 'clearly established' constitutional rights 'of which a reasonable person would have known.'"[184] This standard uses identical language as the standard for qualified immunity—"[t]o be considered clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[185] "The requirement that the unconstitutional conduct be 'flagrant' ensures that a government employee is allowed the ordinary 'human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation.'"[186] With respect to the Unnecessary Rigor clause of the Utah Constitution, in *Dexter v. Bosko* the Utah Supreme Court explained:

> We are satisfied that a flagrant violation of the unnecessary rigor clause has occurred whenever the following two elements are established: First, the nature of the act presents an obvious and known serious risk of harm to the arrested or imprisoned person; and second, knowing of that risk, the official acts without other reasonable justification.[187]

---

[183] *Kuchcinski v. Box Elder Cty.*, 450 P.3d 1056, 1067 (Utah 2019). Plaintiffs must also demonstrate that the constitutional provision is self-executing—the Utah Supreme Court has established that "Article I, section 9 is a self-executing provision." *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996), *abrogated in part on other grounds*, *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533 (Utah 2000).

[184] *Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533, 538 (Utah 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[185] *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987)).

[186] *Id.* (quoting *Bott*, 922 P.2d at 739–40).

[187] *Dexter v. Bosko*, 184 P.3d 592, 598 (Utah 2008).

Applying *Dexter*, the Tenth Circuit has held that an officer is not liable under the Utah state constitution where a plaintiff has not pointed to any precedent that demonstrates that an officer's conduct violates the Unnecessary Rigor clause.[188]

The Plaintiffs have not shown that Daggett County or Jorgensen "flagrantly" violated their constitutional rights. As discussed above when addressing qualified immunity,[189] the Plaintiffs have not identified any clearly established law that demonstrates that Jorgensen must have known that his actions were clearly unlawful when he took them. While Plaintiffs point to case law that indicates that tasing an inmate or subjecting an inmate to dog bites could violate the Unnecessary Rigor clause of the state constitution, they do not point to any case law that indicates that failure to train, supervise, or discipline violates the Unnecessary Rigor clause.[190] There is insufficient evidence that Jorgensen knew that inmates were bitten by dogs or tased. As such, a reasonable fact finder could not determine that the County or Jorgensen "flagrantly" violated their state constitutional rights. Summary judgment is granted for the Defendants on the state-law claim.

---

[188] *Brown v. Larsen*, 653 F. App'x 577, 578 (10th Cir. 2016).

[189] *See supra*, at pages 8–15.

[190] Although Plaintiffs argue that they "have demonstrated that Defendants' conduct, as outlined above, is a flagrant violation of rights," and that "the Utah Constitution provides greater and different protections than the United States Constitution," Opposition at 68, they do not explain how the standard for such a violation is different under the Utah Constitution or cite any case law to that effect. As such, the court analyzes the claim under the same standard as the qualified immunity analysis, which uses identical language. At the end of their Opposition, Plaintiffs indicate that if the court is inclined to dismiss the state constitutional claims, it should do so without prejudice "so that they can be refiled later in state court if necessary." *Id.* at 72. The request is denied. Plaintiffs brought this action in federal court, not state court, and have litigated it over the past four years. Fact discovery has concluded. *See* Order Granting Final Stipulated Motion to Extend Discovery Deadlines at 2, ECF No. 119, filed May 4, 2021. The dispositive motion deadline was months ago. *See id.* The time for dismissal without prejudice is long past. It would be both highly prejudicial and inefficient to allow Plaintiffs, after years of litigation and seeing Defendants' summary judgment motion, to decide that they prefer to relitigate some of their claims in another court.

## ORDER

Defendants are entitled to summary judgment on the state-law claims, the claims against Bailey, the claims against Jorgensen, and failure-to train claims against Daggett County. The Eighth Amendment claim against Daggett County for Sheriff Jorgensen's failure to supervise and discipline remains. Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

Signed February 16, 2022

BY THE COURT

David Barlow
United States District Judge